# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1680
_____

| | |
|---|---|
| United States of America, | \* |
| | \* |
| Appellee, | \* |
| | \* Appeal from the United States |
| v. | \* District Court for the |
| | \* Western District of Missouri. |
| Fabio Montano, also known as | \* |
| Fernando Nieves, | \* |
| | \* |
| Appellant. | \* |

_____

Submitted: September 24, 2007
Filed: November 9, 2007
_____

Before WOLLMAN, HANSEN, and RILEY, Circuit Judges.
_____

RILEY, Circuit Judge.

     After a jury convicted Fabio Montano (Montano) of conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, the district court[1] sentenced Montano to 405 months' imprisonment. On appeal, Montano contends (1) the district court erred in admitting evidence concerning a murder committed in furtherance of the conspiracy, and (2) insufficient evidence supports the conviction. We affirm.

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

## I. BACKGROUND

### A. The Drug Conspiracy

Edwin Hinestroza (Hinestroza) ran a cocaine distribution ring in the Kansas City metropolitan area from 1996 to November 1998 with the assistance of Hebarth Andres-Borja (Andres-Borja) and Andres-Borja's uncle, Julian Colon (Colon). Cocaine shipments came from the "La Oficina" drug cartel in Colombia, South America, via Mexico and Houston. The cocaine was then transported by automobile to Kansas City, concealed in false compartments. Each shipment to Kansas City contained between fifteen and fifty kilograms of cocaine. Hinestroza sold cocaine to Montano and four other major customers. Montano was considered one of Hinestroza's largest customers.

Dominic Lusk (Lusk) was Montano's right-hand man, delivering drugs from Houston to Kansas City for Montano. In a typical delivery, Montano would deliver at least five kilograms of cocaine to Lusk in Houston. Lusk would hide the cocaine in a rental car that he would drive to Kansas City. Lusk was paid with a portion of the cocaine he transported. Lusk also made trips back to Houston, transporting the cash drug proceeds on Montano's behalf. On one trip, law enforcement stopped Lusk, who was carrying $115,000 to $120,000 to Montano's cocaine suppliers in Houston.

Lusk not only transported cocaine to Kansas City for Montano, he also assisted Montano with drug deals in Kansas City. For example, one such drug deal took place in the Bannister Mall parking lot in Kansas City, Missouri. Lusk was driving Montano's car when Montano tossed money to Colon and Andres-Borja, who were in another car, in exchange for a bookbag containing three to five kilograms of cocaine.

Lusk met co-conspirators Andres-Borja, Colon, Hinestroza, and Arboleda Ortiz (Ortiz) through Montano. Later, Lusk began buying cocaine through Andres-Borja, Colon, and Hinestroza. Andres-Borja personally delivered cocaine to Montano on

behalf of the conspiracy and received money from Montano. Andres-Borja's brother, Edward Ortiz (Edward), confirmed a specific delivery of five kilograms of cocaine to Montano's apartment where the cocaine was secreted in Edward's school backpack.

Montano had several drug customers in Kansas City. Marvin Collins (Collins) bought cocaine from Montano for several years, buying between nine ounces and two kilograms at a time. Sometimes the cocaine was delivered by Ortiz and sometimes Montano delivered the drugs to Collins. A friend of Collins, Gregory Watson, was present when Montano and Ortiz delivered three kilograms of cocaine to Collins in exchange for a large amount of cash.

Loren Harris (Harris) bought two to three kilograms of cocaine from Montano every week or two in 1997 and 1998. Sometimes Harris would pick up the cocaine at Montano's Overland Park apartment and other times Montano delivered the cocaine.

Drug ledgers, kept by Andres-Borja and Colon, confirmed cocaine deliveries were made to Montano as well as money owed by Montano for cocaine. For example, one entry read "Fernando owes 3, at $15,000. Paid 2." Andres-Borja explained this entry as Montano had paid $30,000 for two kilograms of cocaine and still owed the conspiracy for three additional kilos at $15,000 each. Other entries denoted transactions where Montano received between one and three kilos of cocaine each transaction, totaling eleven kilos of cocaine.

### B. Colon's Murder

Hinestroza lived in a Kansas City area apartment with Monica Osma (Osma), Colon's sister and Andres-Borja's aunt. On November 19, 1998, the apartment was reportedly robbed by two unknown males, who tied and beat Osma, and demanded to know where she kept the money. After being beaten, Osma told the intruders that the

third stair on the staircase contained a hidden compartment with money. The apartment was ransacked and approximately $240,000 was stolen. Hinestroza was concerned law enforcement might become involved, so Hinestroza sent Osma to Houston for medical treatment.

On November 26, 1998, Hinestroza, Jaime Hurtado (Hurtado), Ortiz, and Pluterco Tello (Tello) visited Osma in Houston. Upon receiving unsatisfactory answers to questions about the robbery, Ortiz and Tello threatened that a dead body must appear in order to satisfy La Oficina. As everyone left the apartment, Osma's nephew, Edward, saw German Sinisterra (Sinisterra) on the street outside the apartment. Edward knew Sinisterra was a killer, testifying later that "if you need someone to get smoked," Sinisterra would do it.

On November 28, 1998, back in Kansas City, Hinestroza asked Andres-Borja and Colon to accompany him to the Drury Inn in Overland Park, Kansas, to meet with Sinisterra, Ortiz, and Tello. Andres-Borja knew Sinisterra and Ortiz as "[g]un[s] for hire" associated with Hinestroza and Montano. Andres-Borja knew Sinisterra was Jaime Hurtado's right hand man and Montano allowed Ortiz to pick up and receive drugs and collect money on Montano's behalf.

Hinestroza told Andres-Borja that Sinisterra, Ortiz, and Tello would accompany them to meet Percy Smith (Smith) to sell Smith over one kilogram of fake cocaine because Hinestroza thought Smith stole the $240,000. Andres-Borja believed Sinesterra, Ortiz, and Tello were along to restrain and maybe kill Smith. After meeting with Smith, Smith led the group into a second house. Hinestroza, Sinesterra, Ortiz, and Tello entered the house, put guns to the heads of Andres-Borja and Colon, physically assaulted them, bound them with duct tape, and continued to beat them. The attackers demanded to know where the money was, referring to the stolen $240,000. The beatings continued, accompanied with demands, taunts and threats of death.

-4-

Andres-Borja was dragged to the basement, and heard Hinestroza order Ortiz and Tello to "shoot [him] in the head," and then, "[s]hoot the other one, too." Colon was shot and killed. Andres-Borja heard footsteps coming down the basement stairs followed by the sound of another gunshot and ringing in his ears. Initially, Andres-Borja thought he was dead. When Andres-Borja realized he was still alive, he pretended to be dead. The attackers carried Andres-Borja out of the house and put him in the trunk of a vehicle alongside Colon's body. The vehicle was driven to Swope Park in Kansas City and abandoned with the bodies still inside. Andres-Borja managed to escape from the trunk. That night, Andres-Borja informed law enforcement about the shooting and the Hinestroza drug conspiracy.

Sinesterra, Ortiz, and later Tello were arrested at the Drury Inn without incident. Telephone records showed Hinestroza fled to Texas immediately following Colon's murder. Montano was detained outside of Room 433 at the Drury Inn in the early morning hours of November 29, 1998. Tello had rented Room 433 the night before and had been arrested stepping out of this room. Montano admitted he was at the room to meet with Ortiz.

Telephone records corroborated the cooperating witnesses' testimony as to Montano's relationships with his co-defendants. There were 43 calls between Ortiz's cell phone and Montano's home phone in Katy, Texas, from September 3, 1998 to November 5, 1998. In addition, records showed 31 calls between Hinestroza's pager number and Montano's cell phone, including nine calls on the day of Colon's murder. Finally, on November 28, 1998, three calls were made from Sinesterra's hotel room to Montano's cell phone.

Police searched Montano's Lexus. The search discovered a slip of paper with the name "German Sinisterra," a piece of paper with the name "Artis," a knife, and receipts for cash and wire transfers. A search of Montano's apartment revealed a loaded handgun, ammunition for a second handgun, cash receipts, and a Sunbeam

-5-

Case 4:98-cr-00311-GAF   Document 1302-1   Filed 11/09/07   Page 5 of 8

scale. A search of another apartment, recently abandoned by Montano, resulted in the recovery of a scrap of paper with Tello's name and date of birth.

## II. DISCUSSION

Montano argues (1) the district court abused its discretion in allowing the government to present evidence of the murder of Colon, and (2) insufficient evidence supports the jury verdict.

### A. Admission of Murder Evidence

We review for abuse of discretion the district court's evidentiary rulings. United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997). In a conspiracy trial, the district court's discretion in evidentiary rulings is particularly broad. Id.

In Dierling, we held evidence of a murder in a drug conspiracy case was relevant and not overly prejudicial when the slaying was an act to control subordinates and the evidence showed the lengths the conspirators would go to protect the conspiracy. Id. at 731. Similarly, Colon's murder was an act to control subordinates. La Oficina did not believe Osma's story regarding the robbery and intended to hold someone responsible for the missing $240,000. Colon's murder was committed by members of the conspiracy to further the conspiracy by demonstrating the lengths to which the conspirators would go to protect their drug dealing interests. The murder also was an attempt by the conspiracy to collect the conspiracy's stolen money. We further note the overt act of one conspirator in a conspiracy is attributable to all conspirators. See Pinkerton v. United States, 328 U.S. 640, 646-47 (1946). As Montano claims, the murder evidence probably is highly prejudicial, but the evidence is not unfairly prejudicial. See Fed. R. Evid. 403. The district court did not abuse its discretion by admitting this evidence.

### B. Sufficiency of the Evidence

Montano asserts the government never proved Montano intentionally joined the conspiracy. To convict Montano of a conspiracy to distribute crack cocaine, the government had to prove (1) the existence of a conspiracy, that is, the agreement to distribute drugs; (2) Montano knew of the conspiracy; and (3) Montano intentionally joined the conspiracy. United States v. Rolon-Ramos, __ F.3d __, 2007 WL 2820288, at *3, No. 07-1066 (8th Cir. Oct. 1, 2007). We review de novo the sufficiency of the evidence to sustain a conviction, examining the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences. United States v. Wintermute, 443 F.3d 993, 1003 (8th Cir. 2006). We will reverse the jury verdict only if no reasonable jury could have found Montano guilty. United States v. Sanders, 341 F.3d 809, 815 (8th Cir. 2003).

Montano concedes the government proved the existence of the Hinestroza cocaine conspiracy. Thus, the only issues are Montano's knowledge of the conspiracy and whether Montano knowingly joined the conspiracy.

Montano acknowledges he bought and sold drugs with members of the conspiracy, and Montano concedes "the Government's evidence established . . . Montano's presence and knowledge of the actions of . . . Hinestroza's organization." Montano undeniably knew of the conspiracy. Montano's real contention is the evidence is deficient to show he joined the conspiracy.

"[A] defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc). Joint delivery and resale of narcotics by purchasers is sufficient to sustain a conspiracy conviction. See United States v. Espino, 317 F.3d 788, 793-94 (8th Cir. 2003). Here, numerous cooperating witnesses testified to Montano's involvement. Andres-Borja and Lusk both testified to a drug transaction between Montano and

-7-

Colon in a Kansas City, Missouri, shopping center parking lot involving three to five kilograms of cocaine. Andres-Borja also testified Montano was one of the Hinestroza cartel's two largest cocaine buyers in Kansas City. Drug ledgers recovered by the FBI corroborated Andres-Borja's testimony with one entry documenting the sale of five kilograms of cocaine to Montano, and another entry documenting the sale of eleven kilograms of cocaine to Montano. Andres-Borja delivered cocaine to Montano, and Lusk transported drugs for Montano on twenty separate occasions. Collins and Harris both bought kilogram quantities of cocaine from Montano, while Watson took delivery of three kilograms of cocaine from Montano and Ortiz. The government's evidence was certainly sufficient to sustain a conspiracy conviction.

Montano also attacks the credibility of the government's witnesses. "It is axiomatic that we do not review questions involving the credibility of witnesses, but leave credibility questions to the jury." United States v. Dabney, 367 F.3d 1040, 1043 (8th Cir. 2004). "The jury is free to believe the testimony of any witness in its entirety, or to reject that testimony as untrustworthy." United States v. One Star, 979 F.2d 1319, 1321 (8th Cir. 1992). In Montano's case, the testimony of the cooperating witnesses was corroborated by other consistent testimony and by the drug ledgers and other exhibits.

We conclude Montano's conviction for conspiracy to distribute more than five kilograms of cocaine is supported by more than sufficient credible evidence.

### III. CONCLUSION
For the foregoing reasons, we affirm Montano's conviction.

_____